**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JEFFREY A., on behalf of J.M.A., a minor,

                              Plaintiff,                                    No. 5:18-CV-195
                                                                            (CFH)

                    v.

ANDREW SAUL,[1]

                              Defendant.

_____

**APPEARANCES:**                                   **OF COUNSEL:**

Olinsky Law Group                                  HOWARD D. OLINKSY, ESQ.
300 S. State Street
Suite 420
Syracuse, New York 13202
Attorney for Plaintiff

Social Security Administration                     JAMES DESIR, ESQ.
Office of Regional General Counsel,                Special Assistant U.S. Attorney
Region II
26 Federal Plaza, Rm. 3904
New York, New York 10278
Attorney for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

        Plaintiff Jeffrey A. brings this action on behalf of his minor son J.M.A. pursuant to

42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for supplemental security income ("SSI")

_____

        [1] Andrew Saul was appointed Commissioner of Social Security, and has been substituted as the
defendant in this action.

payments.  Dkt. No. 1 ("Compl.").[2]  Plaintiff moves for a finding of disability or remand for a further hearing, and the Commissioner cross moves for a judgment on the pleadings.  Dkt. Nos. 9, 14.  For the following reasons, the determination of the Commissioner is affirmed.

## I. Background

J.M.A. was born in 2000.  T. 42.[3]  At the time of his application, he was fourteen years old.  Id. at 156.  J.M.A.'s alleged disability consists of attention deficit hyperactivity disorder ("ADHD").  Id. at 40.  J.M.A. participated in special education classes for "many years," and repeated the second grade.  Id.

On September 10, 2014, Jeffrey A. protectively filed a Title XVI application for supplemental security income on J.M.A.'s behalf, alleging disability beginning on August 16, 2012.  T. 156-61.  The application was initially denied on February 25, 2015. Id. at 68.  Plaintiff requested a hearing, and a hearing was held before Administrative Law Judge ("ALJ") John P. Ramos.  Id. at 35-67, 152.  ALJ Ramos issued an unfavorable decision.  Id. at 11-23. The Appeals Council denied plaintiff's request for review, making the ALJ's findings the final determination of the Commissioner.  Id. at 1-4.  Plaintiff commenced this action on February 14, 2018.  See Compl.

---

[2]  Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  Dkt. No. 5.

[3]  "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Dkt. No. 8.  Citations refer to the pagination in the bottom right-hand corner of the administrative transcript, not the pagination generated by CM/ECF.

## II. Discussion

## A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine *de novo* whether an individual is disabled. <u>See</u> 42 U.S.C. §§ 405(g), 1388(c)(3); <u>Wagner v. Sec'y of Health & Human Servs.</u>, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. <u>See</u> <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987); <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder *would have to conclude otherwise*." <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotations marks omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. <u>See</u> <u>Martone v. Apfel</u>, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing <u>Johnson</u>, 817 F.2d at 986). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the

3

plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

## B. Determination of Disability

To qualify for disability benefits under the Personal Responsibility and Work Opportunity Reconciliation Act, an individual

> under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). The Act does not require that the severity of a child's impairment be of comparable severity to that of a disabled adult. In order to determine if a child is disabled, the ALJ must proceed with a three-step analysis. See 20 C.F.R. § 416.924(a). The first step requires the ALJ to consider whether the child is engaged in substantial gainful activity. Id. at § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. Id. The second step requires an examination as to whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are properly regarded as severe, in that they cause more than a minimal functional limitation. See 20 C.F.R. § 416.924(c); Kittles v. Barnhart, 245 F. Supp. 2d 479, 488 (E.D.N.Y. 2003). In other words, "a child is [disabled under the Social Security Act] if his impairment is as severe as one that would

prevent an adult from working." Zebley v. Sullivan, 493 U.S. 521, 529 (1990). At the third step, the ALJ must determine whether the child has an impairment or combination of impairments that meets or medically equals the severity of a listing under 20 C.F.R. Pt. 404, Subpt. P., Appendix 1. If the child has an impairment or combination of impairments that meets or medically equals the severity of, or functional equivalent of, the listings, and the twelve-month durational requirement is satisfied, the child will be deemed disabled. See 20 C.F.R. § 416.924(d)(1).

In order to determine whether an impairment of combination of impairments functionally equals the listings, the ALJ must assess the child's functioning in six main areas referred to as "domains." See 20 C.F.R. § 416.924(d)(1); see Ramos v. Barnhart, No. 02-CV-3127, 2003 WL 21032012, at *8 (S.D.N.Y. May 6, 2003). The regulations define the domains as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. See id.

If the child has "marked limitations" in two domains or an "extreme limitation" in one domain, then the child's impairment is functionally equivalent to a disability in the Listings. See id. § 416.926a(d). When a child has a marked limitation, the

> impairment(s) interferes seriously with [his or her] ability to independently initiate, sustain, or complete activities. [The child's] day-to-day functioning may be seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities. "Marked" limitation also means a limitation

5

that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is equivalent to the functioning that would be found on standardized testing with scores that are at least two, but less than three, standard deviations below the norm. Id.

An extreme limitation is found where the child's

> impairment(s) interferes very seriously with [his or her] ability to independently initiate, sustain, or complete activities. [The] day-to-day functioning may be very seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked". . . . [but] does not necessarily mean a total lack or loss of ability to function.

20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of functioning found on standardized testing scores that are at least three standard deviations below the mean. Id.

## C. ALJ Decision

Applying the three-step disability sequential evaluation, the ALJ made the following six findings of fact and conclusions of law. First, the ALJ determined that J.M.A. was an "adolescent" at the time of filing and at the time of the decision pursuant to 20 C.F.R. § 416.926a(g)(2). T. 14. Second, the ALJ found that J.M.A. had not engaged in substantial gainful activity since the filing of his application. Id. Third, the ALJ found that J.M.A. had the severe impairment of ADHD. Id. Fourth, the ALJ determined that J.M.A. did not have an impairment or combination of impairments that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. Fifth, the ALJ found that J.M.A. did not have an impairment or combination of impairments that functionally equaled the severity of the Listings. Id. at 15. Sixth, and finally, the ALJ concluded that J.M.A. had "not been disabled, as defined in the Social Security Act, since September 10, 2014, the date the application was filed." Id. at 23.

### D. Arguments

In support of his motion, plaintiff makes two arguments. First, plaintiff argues that the ALJ erred in determining that J.M.A.'s behavior was not symptomatic of his ADHD, and refused to consider certain evidence that demonstrated that he was disabled. Dkt. No. 9 at 16-20. Second, plaintiff argues that the ALJ failed to properly weigh the opinion evidence, specifically, the opinions of J.M.A's teachers. Id. at 20-26. Conversely, the Commissioner argues that the ALJ's decision is supported by substantial evidence. See Dkt. No. 14 at 5-15. Specifically, the Commissioner argues that (1) the ALJ did not err in his evaluation of the medical evidence regarding J.M.A.'s ADHD; and (2) substantial evidence supported the ALJ's evaluation of J.M.A.'s teachers. See id. at 6-15.

### F. Whether the ALJ Improperly Assessed J.M.A.'s ADHD

### 1. Relevant Medical Evidence

In assessing whether plaintiff's ADHD met the severity of one of the Listings, the

ALJ gave significant weight to the medical opinions of the consultative examiner Dr. Carly Melcher, PsyD and the state agency consultant. See T. 16. On January 19, 2015, Dr. Melcher conducted a Child Intelligence Evaluation and a Child Psychiatric Evaluation. Id. at 576-84. In the Intelligence evaluation, Dr. Melcher noted that J.M.A. was of average height and weight, and that he was dressed casually with "fair to poor hygiene." Id. at 577. His posture was normal, and his motor behavior was "restless and fidgety." Id. J.M.A.'s eye contact was appropriate, even though he mostly looked down. Id. Dr. Melcher noted that he had the "hood pulled up over his jacket which often impeded his direct vision[.]" Id. J.M.A.'s speech and language skills appeared age appropriate. Id. Dr. Melcher indicated that he was "cooperative and friendly, though quiet and somewhat shy." Id. Dr. Melcher described J.M.A. as "relaxed and comfortable throughout the testing session, almost lackadaisical." Id. She noted that he recalled and understood directions, and "worked deliberately and methodically with reflection." Id. Aside from occasional fidgeting, plaintiff's attention and concentration appeared good. Id.

Dr. Melcher administered a standardized intelligence test, which demonstrated that J.M.A.'s Full Scale IQ was in the low average range of intellectual functioning. T. 578. The test indicated that J.M.A. struggled in his ability to process information quickly. Id. Dr. Melcher noted that his scores are indicative of ADHD. Id. J.M.A. also struggedl with reading, although it did not appear that his reading score differentiated from his Full Scale IQ overall. Id. J.M.A.'s verbal abilities, perceptual reasoning, and working memory were within or above his Full Scale IQ. Id. As to J.M.A.'s mode of

living, Dr. Melcher indicated that he was able to dress, bathe, and groom himself at age-appropriate levels.  Id.  He was able to assist with household chores, although he sometimes argued.  Id.  J.M.A. got along with family and friends, and enjoyed watching television, playing video games, and listening to music.  Id.

Dr. Melcher opined that J.M.A. had mild to moderate limitation attending to and following directions.  T. 578.  He could understand age-appropriate directions, and had no problems completing age-appropriate tasks, maintaining appropriate social behavior, and responding to changes in the environment.  Id.  Dr. Melcher opined that he had "mild limitations learning in accordance to cognitive functioning," and was able to ask questions and request assistance.  Id.  Dr. Melcher determined that "[t]he results of the evaluation appear to be consistent with psychiatric and cognitive problems, but in and of itself, . . . [did] not appear to be significant enough to interfere with [J.M.A's] ability to function on a daily basis."  Id. at 579.

With regard to the psychiatric evaluation, Dr. Melcher noted that J.M.A. reported normal sleep and appetite.  T. 580.  His general behavioral symptoms included "actively defying or refusing to comply with requests, losing temper easily, and often arguing [with] adults."  Id.  J.M.A. reported that he sometimes gets frustrated in school and walks out of class.  Id.  J.M.A. noted that he had trouble paying attention, difficulty sustaining attention, following through on instructions, and finishing work.  Id.  He described himself as disorganized, easily distracted, and having trouble with fidgeting or squirming.  Id.  J.M.A. indicated that he loses his temper and becomes emotional when he has difficulty following directions.  Id. at 581.  Plaintiff indicated that J.M.A. had

trouble with comprehension and learning quickly, and did not understand things unless they were shown to him with one-on-one attention.  Id.  When this happens at school, J.M.A. noted that he responded with "anger and frustration."  Id.

Dr. Melcher indicated that J.M.A. was cooperative, but "a tad withdrawn."  T. 581. He related age appropriate.  Id.  J.M.A. appeared his stated age, was dressed casually, and was fairly groomed.  Id.  His motor behavior was restless, and he often tapped a pencil or pen and fiddled with things on the desk.  Id.  For the most part, his eye contact was appropriate.  Id. at 582.  J.M.A. mumbled, but his overall intelligibility appeared good.  Id.  The quality of his voice was clear, and his expressive and receptive language was age appropriate.  Id.  J.M.A.'s thought process was coherent and goal directed.  Id. His effect was dysphoric and his mood dysthymic.  Id.  His sensorium was clear and he was oriented x3.  Id.  J.M.A.'s attention and concentration were intact, and he was able to count and perform simple calculations and serial 3s with no problem.  Id.  His recent and remote memory skills were intact, and he was able to recall three objects immediately and after five minutes.  Id.  He also completed digits forward up to five and backward to three.  Id.  J.M.A.'s cognitive functioning appeared average to below average, and his general fund of information was appropriate to experience.  Id.  His insight was age appropriate to fair, and his judgment was fair.  Id.

Dr. Melcher reiterated that J.M.A. had mild to moderate limitation attending to and following directions.  T. 582.  He was able to understand age-appropriate directions.  Id. at 583.  Dr. Melcher opined that J.M.A. had no problems completing age appropriate tasks, maintaining appropriate social behavior, or responding to changes in

the environment.  Id.  He had "mild limitation learning in accordance to cognitive functioning."  Id.  Dr. Melcher noted that J.M.A. was able to ask questions and request assistance.  Id.  He was able to get along okay with peers and adults.  Id.  Dr. Melcher again reiterated that "[t]he results of the evaluation appear to be consistent with psychiatric and cognitive problems, but in and of itself, . . . [did] not appear to be significant enough to interfere with [J.M.A's] ability to function on a daily basis."  Id. at 583.

The state-agency reviewing psychologist J. Dambrocia opined that J.M.A. had less than marked limitations on the areas of acquiring and using information; interacting and relating with others; and caring for himself.  T. 74.  He had no limitations moving about and manipulating objects or in his health and physical well-being.  Id.  J. Dambrocia opined that J.M.A. had marked limitations in attending and completing tasks. Id.  J. Dambrocia found that, although severe, J.M.A.'s functional impairments did not functionally equal a listing.  Id.  J. Dambrocia assessed J.M.A.'s educational records, and noted that although his individualized education plan ("IEP") "indicated continued difficulties" and that J.M.A. was in a 12:1:2 classroom for more support, it also demonstrated that he was "perfectly capable of doing classwork and homework independently" and that he was "a very capable student when he chooses to do the work."  Id. at 75.  The IEP also indicated that J.M.A.'s achievement testing was in the average range, but he needed a "push" to get started.  Id.  J.M.A. "work[ed] for rewards" and would complete his work if he was promised something.  Id.  Although the IEP acknowledged that J.M.A. was "bright," it indicated that he lacked motivation to be

successful. <u>Id.</u>

## 2. Analysis

The Second Circuit has recognized that "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." <u>Greek v. Colvin</u>, 802 F.3d 370, 375 (2d Cir. 2015) (quoting <u>Burgess v. Astrue</u>, 537 F.3d 117, 131 (2d Cir. 2008)). However, there is no legal requirement that the ALJ rely on a medical opinion in every case; rather, the ALJ has the responsibility of reviewing all the evidence before him or her, resolving inconsistencies, and making a determination consistent with the evidence as a whole. <u>See</u> <u>Bliss v. Colvin</u>, No. 3:13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); <u>Petell v. Comm'r of Soc. Sec.</u>, No. 7:12-CV-1596, 2014 WL 1123477, at *10 (N.D.N.Y. Mar. 21, 2014) (same); <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). "[I]t is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon 'adequate findings supported by evidence having rational probative force.'" <u>Camarata v. Colvin</u>, No. 6:14-CV-0578, 2015 WL 4598811, at *9 (N.D.N.Y. July 29, 2015) (quoting <u>Galiotti v. Astrue</u>, 266 F. App'x 66, 67 (2d Cir. 2008) (summary order)).

Plaintiff argues that the ALJ made his own "independent medical findings" with regard to whether certain of J.M.A.'s behavioral issues were linked to his ADHD. <u>See</u>

12

Dkt. No. 9 at 16. Specifically, plaintiff contends that the ALJ erred by "reject[ing] evidence because the limitations described therein were not related to ADHD." Id. The Commissioner, on the other hand, argues that the ALJ committed no error in his evaluation of the evidence and relied on Dr. Melcher and J. Dambrocia's medical opinions, which demonstrated that J.M.A. did not have two marked limitations or one extreme limitation in any domain. See Dkt. No. 14 at 6-7. Although the undersigned finds this to be a close question, the Court agrees with the Commissioner.

In assessing J.M.A.'s behavioral issues in the domain of interacting and relating to others, the ALJ determined that the record contained "no medical evidence directly linking these issues to [J.M.A.'s] ADHD." T. 20. As the Commissioner notes, the record demonstrates that J.M.A. had problems other than ADHD; in fact, Dr. Melcher diagnosed J.M.A. with unspecified anxiety and depressive disorders, but opined that such disorders, in combination with J.M.A.'s ADHD diagnosis, did "not appear to be significant enough to interfere with [his] ability to function on a daily basis." Id. at 583. The ALJ generally adopted that rationale, and found that because "no other source ha[d] diagnosed or treated [J.M.A.] for anxiety or depressive disorder, and [because] Dr. Melcher concluded that [his] psychiatric problems were not significant enough to interfere with his ability to function on a daily basis," these disorders were not severe medically determinable impairments. See id. at 14 (citing id. at 583). The Court notes that the ALJ "is entitled to rely not only on what the record says, but also on what it does not say." Sipe v. Astrue, 873 F. Supp. 2d 471, 478 (N.D.N.Y. 2012) (citing Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)).

13

Even though the ALJ found J.M.A.'s alleged unspecified anxiety and depressive disorders not severe, the ALJ was still permitted to consider those impairments and the effect of those impairments when determining the functional equivalence.  See 20 C.F.R. § 416.926a ("When we make a finding regarding functional equivalence, we will assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments you have that are not 'severe.'").  Moreover, plaintiff testified that J.M.A. suffered from a "multitude of problems."  T. 48.  Thus, to the extent that the ALJ found that certain of J.M.A.'s behavioral issues were not attributed to his ADHD, the record demonstrates that J.M.A. suffered from other non-severe impairments that the ALJ determined did "not appear to be significant enough to interfere with [his] ability to function on a daily basis."  Id. at 583.

The Court further notes that there is no indication that the ALJ failed to take J.M.A.'s behavioral limitations into consideration when rendering his determination. Plaintiff argues that the ALJ erred by relying on J.M.A.'s ability to focus on video games and an appearance of a lack of motivation as to school work as evidence that he was not disabled.  See Dkt. No. 9 at 19-20; T. 18 ("The claimant's father acknowledged that the claimant is able to remain on task when playing games.") (citing T. 177).  The Court disagrees.  In the domain of attending and completing tasks, the ALJ stated that although it was "clear that [J.M.A.] ha[d] limitations in this domain, it [was] also apparent that he [was] able to attend and complete tasks when he applie[d] himself or [was] interested in the activity or subject matter."  T. 19.  As such, the ALJ found that J.M.A. had a "less than marked limitation in attending and completing tasks."  Id.

14

In making that determination, the ALJ weighed testimony from plaintiff that J.M.A.'s ADHD prevented him from completing projects, chores, or schoolwork without help from teachers, as well as reports from his teachers that he had "significant problems in this domain," that he was "easily distracted" and "refuses to do assigned work", against J.M.A.'s school records which indicated that he was "perfectly capable of doing classwork and homework independently" but that he required an added "push" to get started.  T. 18 (citing id. at 291).  J.M.A.'s IEP in 2014 also indicated that although he required some monitoring and redirection, he demonstrated "growth" and "maturity." Id. at 291.

The Court finds this consistent with Dr. Melcher's opinion, wherein she found that J.M.A.'s attention and concentration and recent and remote memory skills were intact. T. 582.  Dr. Melcher noted that J.M.A. was able to count and perform simple calculations and serial 3s without problem.  Id.  J.M.A. also recalled three objects immediately and again after five minutes.  Id.  He also completed five digits forward and three back.  Id.  Dr. Melcher noted that although J.M.A. was "restless and fidgety," he could recall and understand directions and "worked deliberately and methodically with reflection."  Id. at 577.  Dr. Melcher noted that during the child intelligence evaluation, J.M.A.'s "attention and concentration appeared good aside from occasional fidgeting." Id.  Based on her observations, Dr. Melcher opined that J.M.A. had "mild to moderate limitation attending to and following directions."  Id. at 578.  She noted that he was able to understand age-appropriate directions and had no problems completing age-appropriate tasks.  Id.  She determined that such mild to moderate limitations did "not

15

appear to be significant enough to interfere with [J.M.A.'s] ability to function on a daily basis." Id. at 579.

To the extent that the state-agency reviewing psychologist J. Dambrocia found that J.M.A. had a marked limitation in the area of attending and completing tasks, it was within the ALJ's discretion to weigh the evidence available and make a functional equivalence determination that was consistent with the evidence as a whole. See Bliss v. Colvin, No. 3:13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y., Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); White v. Colvin, No. 6:13-CV-0084, 2014 WL 1311993, at *7 (N.D.N.Y. Mar. 31, 2014) ("[I]t is the ALJ's job to properly evaluate the evidence and reconcile any apparent inconsistencies."); Petell v. Comm'r of Soc. Sec., No. 7:12-CV-1596, 2014 WL 1123477, at *10 (N.D.N.Y., Mar. 21, 2014) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (noting that the ALJ is "free to resolve issues of credibility as to lay testimony or choose between properly submitted medical opinions"). As such, the Court finds that the ALJ appropriately weighed the evidence with regard to J.M.A.'s ADHD, and there is no indication that the record was under-developed as to the potential source of any behavioral issues not related to the ADHD. Accordingly, remand is not required on this basis.

### G. Whether the ALJ Improperly Weighed the Opinion
### Evidence of J.M.A.'s Teachers

"While the opinions of educators and other non-medical sources are not entitled to controlling weight under the regulations, they are, nevertheless, deemed valuable sources of evidence in assessing impairment severity and functioning and should be considered by the ALJ."  Reid v. Astrue, No. 1:07-CV-0577 (LEK), 2010 WL 2594611, at *5 n.4 (N.D.N.Y. June 23, 2010) (citing 20 C.F.R. § 404.1513(d)(2)).  "Opinions offered by teachers 'should be evaluated by using the [20 C.F.R. § 416.927] factors,' although 'not every factor . . . will apply in every case.'"  Crouch v. Astrue, No. 5:11-820, 2012 WL 6948676, *3 (N.D.N.Y. Dec. 31, 2012) (citing SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006)), report-recommendation and adopted by 2012 WL 316547 (N.D.N.Y. Jan. 28, 2012).  These factors include "length of the relationship; consistency with other record evidence; extent of supporting evidence; cogency of the source's explanation; and expertise of the source."  Bonet ex rel. T.B. v. Astrue, No. 1:11-CV-1140 (GLS), 2012 WL 3544830, at *7 (N.D.N.Y. Aug. 16, 2012) (citing SSR 06-03p, 2006 WL 2329939, at *4-5).

The ALJ granted "somewhat less weight" to the functional evaluations of J.M.A.'s teachers as "not all of the reported issues [were] relatable to [J.M.A.'s] ADHD."  T. 16.  Plaintiff argues that the ALJ erred in rejecting the opinions of J.M.A.'s teachers without providing a legitimate reason for that rejection.  See Dkt. No. 9 at 20.  Conversely, the Commissioner argues that the ALJ provided good reasons for discounting J.M.A.'s teachers opinions, and such evaluation was supported by substantial evidence.  Dkt.

No. 14 at 9.

## 1. Acquiring and Using Information

The domain of acquiring and using information considers "how well [a child] acquire[s] or learn[s] information, and how well [the child] use[s] the information [he or she] [has] learned." 20 C.F.R. § 416.926a(g). The regulations state that adolescents[4] "should continue to demonstrate what [they] have learned in academic assignments; . . . be able to use what [they] have learned in daily living situations without assistance; . . . be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations; . . . [and] learn to apply these skills in practical ways that will help you enter the workplace after you finish school." 20 C.F.R. § 416.926a(g)(2)(v). In this domain, the ALJ found that J.M.A. "ha[d] less than marked limitations[.]" T. 17.

Both of J.M.A.'s teachers who submitted questionnaires noted that J.M.A. had problems functioning in this domain. See T. 208, 502. Nancy Howard indicated that J.M.A. had very serious problems understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; recalling and applying previously learned material; and applying problem-solving skills in class discussions. Id. at 208. Ms. Howard indicated that J.M.A. had serious problems comprehending oral instructions and expressing ideas in written form. Id. She noted that J.M.A. had

---

[4] The regulations defines adolescents as children ages twelve through eighteen. See 20 C.F.R. § 416.926a(g)(2)(v).

obvious problems understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; and learning new material.  Id.  Ms. Howard indicated that most of J.M.A.'s problems were due to him "not wanting to do any work."  Id.

Stephanie Downey indicated that J.M.A. had very serious problems expressing ideas in written form; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions.  T. 503.  J.M.A. had serious problems understanding and participating in class discussions.  Id.  Ms. Downey noted that J.M.A. had obvious problems comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; and understanding and participating in class discussions.[5]  Id. at 502-03.  She further indicated that J.M.A. had a slight problem comprehending and doing math problems.  Id. at 502.

The Court agrees with the Commissioner, and finds that the ALJ's assessment of a "less than marked limitation" in the acquiring and using information domain is supported by substantial evidence.  There is no indication that the ALJ "failed to properly consider" Ms. Howard's opinion, as plaintiff argues.  See Dkt. No. 9 at 22.  Ms. Howard and Ms. Downey's assessments that J.M.A. suffered from, at most, "[a] serious problem" in certain areas under the acquiring and using information domain do not automatically translate into a marked limitation.  It is "within the purview of the ALJ to

---

[5] Ms. Downey circled both 3, indicating an obvious problem, and 4, indicating a serious problem, for the area of understanding and participating in class discussions.  See T. 502-03.

evaluate [the] evidence and, based on the record as a whole, accord it the appropriate weight." Williams v. Comm'r. of Soc. Sec., 462 F. Supp. 2d 411, 414 (W.D.N.Y. 2006) (citing Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force[,]" this Court cannot substitute its own judgment for that of the Commissioner)). Moreover, it was reasonable for the ALJ to rely on other relevant evidence in the record to the extent that he did, especially where the teachers' opinions are inconsistent with the record as a whole. Cf. Crouch, 2012 WL 6948676, at *3 ("The opinion of a 'non-medical source,' such as a teacher, may even 'outweigh the opinion from a medical source,' when the teacher 'has seen the individual more often and has greater knowledge of the individual's functioning over time and if the [teacher's] opinion has better supporting evidence *and* is more consistent with the evidence as a whole.'") (emphasis in original) (citing SSR 06-03p, 2006 WL 2329939, at *6).  Instead, the ALJ focused on the evidence that indicated that J.M.A.'s behavioral issues were due to problems focusing and a loss of control.  T. 17 (citing id. at 174 ("Its mainly a problem focusing — once the ADHD starts kicking in he loses control and when he calms down he is fine again.").  He also indicated that J.M.A.'s teachers described him as "a very capable student when he chooses to do the work" and a "very bright young man, that lacks the motivation to be successful in school." Id. (citing id. at 198, 258).

The ALJ also relied on Dr. Melcher's opinion, wherein J.M.A. retained a Full Scale IQ score in the low average range of intellectual functioning on the Wechsler Intelligence Scale for Children, Fourth Edition.  T. 17 (citing id. at 577-78).  Moreover,

Dr. Melcher indicated that J.M.A. only had mild limitation learning due to cognitive functioning.  Id. at 578, 583.  As such, although Dr. Melcher lacked a longstanding treating relationship with J.M.A., the ALJ was still entitled to rely on her opinion in his assessment as "state agency medical consultants are considered 'highly-qualified' physicians . . . who are also experts in Social Security disability evaluations.'" Santos-Sanchez v. Astrue, 723 F. Supp.2d 630, 638 (S.D.N.Y. 2010) (quoting 20 C.F.R. § 404.1527(f)(2)(I)).  Further, after a review of the entirety of the evidence, J. Dambrocia opined that J.M.A. had less than marked limitations in the domain of acquiring and using information.  T. 74.

As to plaintiff's argument that the ALJ should have given more weight to J.M.A.s teachers' questionnaires, the Court notes that it was "well within the ALJ's realm to resolve conflicting reports on the before him, and this Court cannot — and will not — disturb his conclusion."  Lopez ex rel. L.J.L. v. Comm'r. of Soc. Sec., No. 11 Civ. 5792(KBF), 2012 WL 2497275, at *6 (S.D.N.Y. June 25, 2012) (citing Veino, 312 F.3d at 586).  Thus, the evidence is sufficient to support the ALJ's conclusion that J.M.A. did not suffer from a marked limitation in the acquiring and using information domain because his limitations did not "interfere[ ] seriously with [his] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  As such, the Court will not disturb the determination of the Commissioner.

### 2. Attending and Completing Tasks

The domain of attending and completing tasks considers "how well [a child] [is]

able to focus and maintain [his or her] attention, and how well [the child] begin[s], carr[ies] through, and finish[es] [his or her] activities, including the pace at which [he or she] perform[s] activities and the ease with which [he or she] change[s] them." 20 C.F.R. § 416.926a(h).  The regulations indicate that adolescents should be able to "pay attention to increasingly longer presentations and discussions, maintain [their] concentration while reading textbooks, and independently plan and complete long-range academic projects"; "organize [their] materials and to plan [their] time in order to complete school tasks and assignments"; and "maintain [their] attention on a task for extended periods of time, and not be unduly distracted by [their] peers or unduly distracting to them in a school or work setting."  Id. § 416.926a(h)(2)(v).   In this domain, the ALJ found that J.M.A. "ha[d] less than marked limitation[s.]"  T. 19.

Both of J.M.A.'s teachers who submitted questionnaires noted that J.M.A. had problems functioning in this domain.  See T. 209, 503.   Ms. Howard indicated that J.M.A. had very serious problems paying attention when spoken to directly; sustaining attention during play/sports activities; focusing long enough to finish assigned activity or task; refocusing to task when necessary; carrying out single-step instructions; carrying out multi-step instructions; waiting to take turns; changing from one activity to another without being disruptive; completing class/homework assignments; completing work accurately without careless mistakes; working without distracting himself or others; and working at a reasonable pace/finishing on time.  Id. at 209.  He had an obvious problem organizing his own things or school materials.  Id.  Ms. Howard noted that J.M.A. had been failing all of his subjects since the first progress report, and that he refused to do

any work.  Id.

Ms. Downey indicated that J.M.A. had serious problems sustaining attention during play/sports activities; focusing long enough to finish assigned activity or task; refocusing to task when necessary; and carrying out multi-step instructions.  T. 503.  J.M.A. had serious problems  paying attention when spoken to directly; carrying out single-step instructions; changing from one activity to another without being disruptive; completing class/homework assignments; completing work accurately without careless mistakes; working without distracting himself or others; and working at a reasonable pace/finishing on time.  Id.  J.M.A. had obvious problems waiting to take turns and organizing his own things or school materials.  Id.  Ms. Downey indicated that these problems occurred hourly.  Id.  She also noted that J.M.A. was "easily distracted, constantly touching things in the classroom, has difficulty remaining in class, and 'gets lost' transitioning from class[ to] class."  Id. at 504.

The Court finds that the ALJ's assessment of a "less than marked limitation" in this domain is supported by substantial evidence for many of the same reasons discussed in Section II.F.2. above.  See supra, at 12-16.  The ALJ found that the teachers' assessments were inconsistent with Dr. Melcher's opinion that J.M.A. had mild to moderate limitations in this domain, but that they did not appear to be significant enough to interfere with [J.M.A.'s] ability to function on a daily basis."  T. 579.  Dr. Melcher observed that J.M.A.'s attention and concentration and recent and remote memory skills were intact, and that he was able to count and perform simple calculations and serial 3s.  Id. at 582.  Moreover, it was within the ALJ's discretion to

23

reject the portion of J. Dambrocia's opinion that he felt was inconsistent with other evidence in the record, including Dr. Melcher's opinion.  See Veino, 312 F.3d at 588 (concluding that the ALJ may credit a portion of a consultative examiner's opinion and discredit a portion he or she finds inconsistent with the relevant evidence).  Further, the ALJ also considered J.M.A.'s ability to perform activities of daily living including playing video games, assist with chores, and watching television.  Id. at 18-19 (citing id. at 578, 582).  The undersigned notes that although the record is clear that J.M.A. had limitations in this area, substantial evidence exists in the record to support the ALJ's conclusion that J.M.A. had a less than marked limitation.  See Rosado, 805 F. Supp. at 153 ("The [Commissioner's] finding will be sustained if supported by substantial evidence, even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's].").

As such, for the reasons set forth herein and above, the Court finds that substantial evidence supports the ALJ's conclusion that although it was "clear that [J.M.A.] ha[d] limitations in this domain, it [was] also apparent that he [was] able to attend and complete tasks when he applie[d] himself or [was] interested in the activity or subject matter."  T. 19.  Accordingly, remand on this ground is not warranted.

### 3. Interacting and Relating with Others

The domain of interacting and relating with others considers "how well [the child] initiate and sustain emotional connections with others, develop and use the language of

your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations indicate that adolescents should be able to "initiate and develop friendships with children who are [their] age and to relate appropriately to other children and adults, both individually and in groups"; "solve conflicts between [themselves] and peers or family members or adults outside [their] family"; " recognize that there are different social rules for [them] and [their] friends and for acquaintances or adults"; "intelligibly express [their] feelings, ask for assistance in getting [his or her] needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers)." Id. § 416.926a(i)(2)(v). In this domain, the ALJ found that J.M.A. had a "less than marked limitation." T. 20.

Ms. Howard indicated that J.M.A. had very serious problems playing cooperatively with other children; making and keeping friends; seeking attention appropriately; expressing anger appropriately; asking permission appropriately; following rules (classroom, games, sports); respecting and obeying adults in authority; using language appropriate to the situation and listening; introducing and maintaining relevant and appropriate topics of conversation; taking turns in a conversation; interpreting meaning of facial expressions, body language, hints and sarcasm; and using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation. T. 210. Ms. Howard further noted that J.M.A. had a serious

problem relating experiences and telling stories.  Id.

Ms. Downey indicated that J.M.A. had very serious problems making and keeping friends; seeking attention appropriately; following rules (classroom, games, sports); and using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation.  T. 504.  J.M.A. had serious problems playing cooperatively with other children; asking permission appropriately; respecting and obeying adults in authority; relating experiences and telling stories; and  introducing and maintaining relevant and appropriate topics of conversation.  Id.  J.M.A. further showed obvious problems expressing anger appropriately; using language appropriate to the situation and listening; taking turns in a conversation; and interpreting the meaning of facial expressions, body language, hints, and sarcasm.  Id.

As the whether the ALJ erred in concluding that J.M.A. had a less than marked limitation in this domain, the Court finds this to be a close question.  As plaintiff sets forth, J.M.A.'s disciplinary records demonstrate various behavioral problems in this domain, including disrespecting other students and staff members, using "abuse language," exhibiting disruptive behavior, being uncooperative, and getting into fights.  T. 286-87, 323, 355, 357-58, 370, 374, 378, 380-81, 384, 386, 394, 398-99, 402, 418, 441-43, 448-49, 460; Dkt. No. 9 at 24.  However, the record does support the ALJ's conclusion that J.M.A.'s behavioral problems at school had improved over time, with a majority of the infractions occurring during the 2012-2013 and 2013-2014 school years, and becoming less frequent throughout 2015 and 2016.  See  T. 286-87, 323, 355, 357-58, 370, 374, 378, 380-81, 384, 386, 394, 398-99, 402, 418, 441-43, 448-49, 460; see

also id. at 20 ("Overall, the record shows that the claimant's behavioral issues, which have primarily occurred at school, have improved.").  Moreover, although plaintiff is correct that J.M.A.'s IEP illustrates that he had a "difficult time establishing positive relationships with adults," id. at 199; Dkt. No. 9 at 24, the IEP also established that J.M.A. had "progressed in the ACES program since his return from Home Instruction in January" and that he had "done significantly better in both his academics and behavioral functioning."  T. 292.  The IEP also notes that although J.M.A. did not appear to have close friends, he "continue[d] to get along with his peers" and was "respectful of peers."  Id.  The IEP states that J.M.A. "ha[d] the potential to display socially appropriate behavior once he fe[lt] comfortable in a situation," and "enjoy[ed] spending time socialziing with adults and can carry on intelligent conversation."  Id.  Moreover, as the ALJ and the Commissioner observed, J.M.A.'s primary care provider consistently indicated that he was cooperative during examinations.  T. 20; Dkt. No. 14 (citing T. 522, 525, 529, 538, 543, 549, 570, 592).

This evidence is also consistent with Dr. Melcher's opinion, wherein she indicated that J.M.A. was cooperative and related age appropriately.  T. 581.  Based on her observations and evaluation, Dr. Melcher opined that J.M.A. had "no problems completing age-appropriate tasks, maintaining appropriate social behavior, and responding to changes in the environment."  Id. at 583.  J. Dambrocia also found that J.M.A. had a less than marked limitation in this domain, citing evidence demonstrating his improvement at school socially, as well as indications that he appeared "likeable" and was "respectful of his peers, enjoy[ed] socializing, and sense of humor."  Id. at 74-

75.

      The Court notes that the substantial evidence standard is "a very deferential standard of review," and that "once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise." Brault, 683 F.3d at 448 (internal quotations marks omitted). Based on the evidence in the record, the Court concludes that substantial evidence supports the ALJ's determination that J.M.A. had a less than marked limitation in the domain of interacting and relating to others. The Court acknowledges that evidence exists in the record demonstrating that J.M.A. had limitations in this domain; however, in assessing the entire record, the Court finds that it is not enough to overcome this highly deferential standard. See id. As such, remand is inappropriate on this ground.

### 4. Caring for Yourself

      The domain of caring for yourself considers "how well [the child] maintain[s] a healthy emotional and physical state, including how well [he or she] get[s] [his or her] physical and emotional wants and needs met in appropriate ways; how [he or she] cope[s] with stress and changes in [his or her] environment; and whether [he or she] take[s] care of [his or her] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). The regulations state that adolescents "should feel more independent from others and should be increasingly independent in all of [their] day-to-day activities"; "may sometimes experience confusion in the way [they] feel about [themselves]"; "should begin to notice significant changes in [their] body's development and this can

28

result in anxiety or worrying about themselves or and their bod[ies]. Sometimes these worries can make [them] feel angry or frustrated"; "should begin to discover appropriate ways to express [their] feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm [themselves] down)"; "should begin to think seriously about [their] future plans, and what [they] will do when [they] finish school." Id. § 416.926a(k)(2)(v). In this domain, the ALJ found that J.M.A. had a less than marked limitation. T. 22.

Ms. Howard noted that J.M.A. had very serious problems handling frustration appropriately; being patient when necessary; using good judgment regarding personal safety and dangerous circumstances; identifying and appropriately asserting emotional needs; responding appropriately to changes in his own mood; using appropriate coping skills to meet daily demands of school environment; and knowing when to ask for help. T. 212. Ms. Downey indicated that J.M.A. had very serious problems using good judgment regarding personal safety and dangerous circumstances; using appropriate coping skills to meet daily demands of school environment; and knowing when to ask for help. Id. at 506. Ms. Downey noted that J.M.A. had these problems hourly. Id.

Plaintiff argues that the ALJ incorrectly based his determination that J.M.A. had a less than marked limitation in this domain on J.M.A.'s ability to "take care of his personal needs and safety" because, he argues, this domain does not take account "self-care tasks." Dkt. No. 9 at 25. Although plaintiff is correct that the Social Security Rulings do state that, in assessing the domain of caring for yourself, the ALJ is to "focus on how well a child relates to self by maintaining a healthy emotional and physical state

29

in ways that are age-appropriate and in comparison to other same-age children who do not have impairments," Title Xvi: Determining Childhood Disability-the Functional Equivalence Domain of "Caring for Yourself", SSR 09-7P (S.S.A. Feb. 17, 2009), the regulations do allow the ALJ to consider whether the claimant the claimant can dress himself appropriately for his age due to an impairment that affects his domain. See 20 C.F.R. § 416.926a(k)(3)(iii). As such, the ALJ appropriately assessed the significant limitations set forth by his teachers, as well as his "unwillingness to invest in his own education," T. 602, against testimony that J.M.A.'s ADHD did not prevent him from bathing, dressing, and grooming himself or otherwise helping with household chores. See T. 22 (citing id. at 582). Moreover, it is clear that J.M.A. still engaged in activities that he enjoyed, including playing video games, watching television, and caring for his dog. Id. at 62, 582; see 20 C.F.R. § 416.926a(k)(3)(v) (noting that the ALJ may consider whether the claimant "spontaneously pursue enjoyable activities or interests.").

Further consistent with a less than marked limitation, Dr. Melcher indicated that J.M.A. had coherent and goal-directed thought processes, fair judgment, and age-appropriate to fair insight. T. 582. She opined that J.M.A. was able to ask questions and request assistance when necessary, and was aware of danger and when to take precaution. Id. at 583. After consideration of the evidence, J. Dambrocia also opined that J.M.A. had a less than marked limitation in this domain. Id. at 74.

Thus, the Court concludes that the evidence is sufficient to support the ALJ's conclusion that J.M.A. did not suffer from a marked limitation in the caring for oneself domain because his limitations did not "interfere[ ] seriously with [his] ability to

independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).

As such, the Court will not disturb the determination of the Commissioner.

### III. Conclusion

**WHEREFORE**, for the reasons stated above, it is hereby:

**ORDERED**, that plaintiff Jeffrey A.'s motion (Dkt. No. 9) is **DENIED**; and it is

further

**ORDERED**, that the Commissioner's motion for judgment on the pleadings (Dkt.

No. 14) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-

Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated:      July 15, 2019
            Albany, New York

Christian F. Hummel
U.S. Magistrate Judge